[Civ. No. 1487. Third Appellate District.—February 23, 1916.]

# POTRERO NUEVO LAND COMPANY, Appellant, v. ALL PERSONS, etc., Respondents.

PARTITION—EFFECT OF DECREE.—A decree or judgment in partition has no other effect than to sever the unity of possession, and does not vest in either of the cotenants any new or additional title.

ID.—LEASEHOLD INTERESTS IN BEACH AND WATER LOTS OF SAN FRANCISCO—PARTITION SALE—INTERESTS ACQUIRED BY PURCHASERS.— Purchasers at a partition sale of leasehold interests in "beach and water lots" situated in the city and county of San Francisco acquire the interests of such partitioners at the time of sale and nothing more, and the subsequent purchase by one of such purchasers of the reversionary interest of the state in such lots does not inure to the benefit of his copurchasers.

ID.—TITLE OF PURCHASER UPON PARTITION SALE.—The sale under a partition decree is a judicial sale, and the rule in execution sales that the purchaser takes the precise interest of the defendant and that after-acquired title by the seller does not pass to the purchaser is applicable thereto.

ID.—HOLDERS OF ALCALDE DEEDS TO BEACH AND WATER LOTS—TITLE BY ADVERSE POSSESSION.—Title by adverse possession to beach and water lots of the city and county of San Francisco cannot be acquired by holders of alcalde deeds and their successors in interest, as against the purchasers of the reversionary interests of the state therein, as the possession of such holders and that of their successors is under the state grant of the leasehold interest.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial. B. V. Sargent, Judge presiding at trial. Bernard J. Flood, Judge denying a new trial.

The facts are stated in the opinion of the court.

A. Everett Ball, for Appellant.

Thomas, Beedy & Lanagan, Nowlin & Fassett, and F. J. Castlehun, for Respondents.

CHIPMAN, P. J.—This is an action to quiet the title to certain real property known as "beach and water lots," situated in the city of San Francisco. The action is commenced under the so-called McEnerney Act.

Plaintiff alleged that it "is the owner of an estate in inheritance and in the possession actual and peaceable thereof by its tenants or persons holding under it" in certain nine parcels of real property described in the complaint, the same being part of the beach and water lots formerly belonging to the state of California; alleged that, on March 26, 1851, the legislature passed an act granting to the city of San Francisco certain land in said act designated, for the term of ninety-nine years from and after the date of said act (Stats. 1851, p. 37), "except all lands mentioned in said act . . . which had been sold or granted by any alcalde . . . and also registered or recorded in some book of record . . . of the recorder of the county of San Francisco, on or before the 3rd day of April, A. D. 1850," which said lands were by said act "granted and confirmed to the purchaser or purchasers or their grantees aforesaid by the state relinquishing the use and occupation of the same, and her interest in the same, to the said purchasers and grantees . . . "; that the use and occupation of the land described in the complaint for ninety-nine years "were sold and conveyed to various persons, unknown to this plaintiff, and they or their grantees are now the owners and holders of said leasehold interest, which will expire March 26, 1950"; that, on May 18, 1853, the legislature passed an act entitled "An act to provide for the sale of the interest of the state of California in the property within the Water line Front of the city of San Francisco," as defined by the act of March 26, 1851, whereby provisions were made "to sell and dispose of the reversionary interest retained by the state of California after the expiration of the ninety-nine years' use and occupation, conveyed to the city of San Francisco by said act of March 26, 1851, or to those persons mentioned in the exception in said act" (Stats. 1852, p. 219); that by said act of May 18, 1853, five commissioners were to be appointed by the Governor of the state, who should have charge and disposition of said lands at public auction; that said commissioners, acting under said act, sold the land described in the complaint to one John Bensley, and, on February 7, 1855, executed and delivered to him a deed thereof, which was duly recorded and thereby the reversionary interest of the state was duly conveyed to said Bensley, and he thereby became the owner in fee simple thereof, subject to the leasehold interest granted to the said city and to the persons mentioned in the exceptions

in said act of March 26, 1851, for the term of ninety-nine years; that the title so conveyed to said Bensley was, by divers mesne conveyances, conveyed to plaintiff, who is now the owner and holder thereof.

Defendant, California Fruit Canners' Association, answered that, ever since January 1, 1899, "it has been and now is the owner of, and in the actual and peaceable possession in fee simple" of certain parcels of land, being part of that mentioned in the complaint, "and that no other person has any right, title, claim, or interest in or to the same, or any part thereof whatsoever"; this defendant claiming the same adversely against all the world, having paid all the taxes thereon since said date.

Defendant Albert Jacobs pleads a judgment duly made and entered on December 30, 1910, in his favor in an action against "All Persons," establishing his title to one of the parcels mentioned in the complaint; he also pleads title by adverse possession.

Defendant Mathilda Schweitzer alleges that she entered into possession of one of the parcels, mentioned in the complaint, under deed from Chas. C. Bemis and wife, dated June 27, 1893, and for a period of eighteen years immediately preceding the commencement of the action, and ever since said date, has continued in the possession of said premises, paying all taxes levied and assessed upon said land.

There were other lands involved in the action as to which the court made findings and entered its decree in favor of plaintiff, but no question arises as to them in this appeal.

The cause was tried by the court and its findings of fact were: "That plaintiff is not the owner of an estate in inheritance of the property claimed by the defendants who answered as shown above; that the property by these defendants claimed was granted to William C. Parker by T. M. Leavenworth, alcalde, by a grant dated June 24, 1848, and recorded January 7, 1850, . . . and said defendants, by divers mesne conveyances hold the said title of said William C. Parker and ever since the date of the said grant to said William C. Parker, have been and they are now in the actual and peaceable possession of the property claimed by them under said conveyances, and that the said defendants and all of them by their predecessors in interest, went into the possession of the respective lots or parcels of land claimed by them in their

answers filed herein, and they and their predecessors in interest have held and used the same adversely to the whole world, claiming to be the owners in fee simple absolute ever since the date of the said grant to William C. Parker.'' It is also found that said defendants paid all taxes levied upon said property during all said time. The court found that the legislature passed the acts as set forth in the complaint, and that the use and occupation for ninety-nine years of the lands described in the complaint ''were sold and conveyed to various persons, unknown to plaintiff,'' as alleged; also, that the legislature passed the act of May 18, 1853, and the act of March 26, 1851, as alleged; that five commissioners were appointed by the Governor as provided by the act of May 18, 1853, and said board proceeded under said act to sell, and did sell, at public auction ''said reversionary interest of the state of California, to the land described herein, to one John Bensley and thereafter and on the 7th day of February, 1855, made, executed and delivered to him, a good and sufficient deed thereof.'' It is then found that, on November 3, 1853, said Bensley was the owner of an undivided one-eighth interest in said lands by virtue of said alcalde grant to said Parker and the act of March 26, 1851; that, on that day, November 3, 1853, Bensley and other cotenants holding the same title brought suit in partition against other cotenants, alleging fee-simple title, and, on March 8, 1854, an interlocutory decree was entered by the consent of all parties, in which it was recited that all the parties to the action were seized of the lands mentioned as tenants in common in fee simple, and a referee was appointed to sell said lands; that, on April 3, 1854, said Bensley and all other parties to the action executed and delivered to said referee quitclaim deeds to said property, and, on the same day, the referee made and delivered deeds to the purchasers at the partition sale who are the predecessors in interest of the defendants; that, on October 21, 1854, the report of the referee was filed showing the sale of said property, and on the same day the report was confirmed and the referee directed to make the conveyances and receive the money; that, on March 3, 1855, the final report of the referee was filed, confirmed, and the referee discharged.

It is then found that, on October 26, 1854, said Bensley bought, at public auction, the state title described in the complaint, under the act of March 26, 1851, and, on February 7,

1855, the commissioners appointed under said act "delivered the deed to the said property to the said John Bensley and thereafter said John Bensley conveyed whatever right, title or interest he had in said lands to plaintiff's predecessors in interest and they in turn by mesne conveyances, conveyed whatever right, title or interest they had received from said John Bensley to the plaintiff herein."

The foregoing of the findings cover all the controverted questions.

As conclusions of law, the court found that plaintiff has no right, title, interest, or estate in the lands claimed by the above-named defendants, and the latter are owners in fee simple of the lands claimed by them respectively.

Judgment was accordingly entered, from which and from the order denying its motion for a new trial plaintiff appeals.

Appellant states the point at issue thus: "If the court below was correct in holding that the purchasers at the partition sale obtained by virtue of the referee's deed in partition, the after-acquired title of Bensley, then our appeal must fall, but if the court was in error in that regard, then we must prevail."

Respondents contend that they had possession under the alcalde deed to Parker and under claim of right prior to the act of March 26, 1851, and were in possession when the act passed, and have ever since that time continued their possession actually, openly, and adversely to all the world. In short, they claim that the grant to Parker has ripened into a fee-simple title by adverse possession.

They claim, furthermore, that the purchase of the leasehold interest in the property at the partition sale by their predecessors in estate carried with it the title to the reversion afterward purchased by Bensley—that his purchase inured to their benefit.

The controversy relates exclusively to the claim of plaintiff to the reversion formerly belonging to the state purchased by Bensley after the partition sale.

Bensley and his cotenants brought an action to have their interests partitioned and sold. The interest so claimed by them arose "by virtue of said alcalde grant to Wm. C. Parker, and the act of March 26, 1851." In their complaint they alleged title in fee simple, and in the interlocutory decree in the action it was recited "that the parties to this action are

seized of and entitled to the lands or lots mentioned in the complaint as tenants in common thereof in fee simple.'' It seems to be conceded, however, that this interest was a leasehold interest to which these cotenants became entitled under the act of March 26, 1851, by reason of having a conveyance from the alcalde and thus coming within the exceptions of that act. While, therefore, they alleged a fee simple and the decree recited that they were ''tenants in common in fee simple,'' the fact was that the interest sold by the referee was the leasehold mentioned in the statute. This is shown by the subsequent sale of the reversion to Bensley, which defendants insist inured to their benefit, and in fact, if true, would have resulted in giving them the complete title.

The form of deed executed by the referee, set out in the transcript, is quitclaim, and purports only to convey ''all the right, title and interest in and to the same which the first party (referee) now has.'' All the cotenants had previously conveyed their interest by quitclaim to the referee, and this interest arose out of the act of 1851.

''It is well settled that a decree of judgment in partition has no other effect than to sever the unity of possession, and does not vest in either of the cotenants any new or additional title. After the partition each had precisely the same title which he had before.'' (*Wade* v. *Deray,* 50 Cal. 376, 380; Freeman on Cotenancy, sec. 531; *Love* v. *Blauw,* 61 Kan. 496, [78 Am. St. Rep. 334, 48 L. R. A. 257, 59 Pac. 1059].) Mr. Freeman, in explanation, says: ''The truth is that a judgment in partition is as conclusive as any other. It does not create or manufacture a title, nor divest the title of anyone not actually or constructively a party to the suit; but it operates by way of estoppel; . . . it divests all titles held by any of the parties at the institution of the suit.'' (Freeman on Cotenancy, sec. 531.) The state was not a party to this action, and as the owner of the reversion or remainder, it was not bound by the decree. The leasehold alone was the title in issue.

Did the purchase of the reversion by Bensley, one of the cotenants in partition, inure to the benefit of the other cotenants or the purchasers at the partition sale? We think it did not.

On April 3, 1854, Bensley and his cotenants quitclaimed to the referee, ''and on the same day the said referee made and executed sufficient deeds (by quitclaim) to the purchasers at

the partition sale who are the predecessors in interest of defendants,'' as was found by the court. One of these deeds, put in evidence by defendants, executed by the referee, is dated "April 3, 1854, recorded May 30, 1854, in Liber 39 Deeds, page 382. Consideration $390." The record states "that similar deeds of said referee were made to the predecessors of defendants conveying all the property claimed by defendants." Subsequently, October 21, 1854, the referee made his report "showing a sale of said property, and on the same day the report was confirmed and the referee directed to make the conveyances and receive the money." He had, however, already made and delivered the deeds and received the money, and by the order of the court his acts were confirmed. On October 26, 1854, Bensley "bought, at public auction, the state title to the property described in the complaint herein, under and by virtue of the provisions of the act of . . . the 26th day of March, 1851, and on February 7, 1855, the commissioners appointed under and by virtue of the provisions of said act delivered the deed to the said property to the said John Bensley and thereafter said John Bensley conveyed whatever right, title or interest he had in said lands to plaintiff's predecessors in interest and they in turn, by mesne conveyances, conveyed" this interest to plaintiff.

"The estoppel arising from judgments is usually, if not universally, confined to rights held by the parties to the suit, and which they could not, if so disposed, have asserted. . . . The same rule has been adjudged to be equally applicable to judgments in partition. Hence, a party to a partition who subsequently acquired a new and independent title—one that in no way was represented by any of the parties to the partition—was permitted to successfully assert such title when it proved to be paramount to the one involved in the partition suit." (Freeman on Cotenancy, sec. 532.)

In the case of *Rupert* v. *Jones,* 119 Cal. 111, [51 Pac. 26], plaintiff was permitted to quiet his title against an execution sale made while he was in possession under a pre-emption claim, by showing patent from the United States issued after the date of the sale of the right or title levied upon, holding, as was held in *Thrift* v. *Delaney,* 69 Cal. 188, 192, [10 Pac. 475], and other cases, that the after-acquired title did not pass by the sale. *Jameson* v. *Hayward,* 106 Cal. 682, [46 Am. St. Rep. 268, 39 Pac. 1078], was a partition case in which the

rights involved arose out of the act here being considered— the act of 1851. Plaintiff was the owner of an undivided one-tenth of an estate for years, to wit, ninety-nine years, in and to two of the three lots; one George Brown owned an undivided tenth interest of like estate in the third lot; Hayward owned a like estate in nine-tenths in all three lots, and he also was the owner of the whole of the remainder or reversion, after the termination of said estate of ninety-nine years. The trial court refused to ascertain and settle the proportionate value of the future estate of Hayward, and entered its decree ordering the sale of the estate for ninety-nine years and refusing to order a sale of the reversion. On appeal the judgment was affirmed. The court said: "The estate for years, in which all the parties have an interest, has nearly a half a century to run. Plaintiff and Brown have no interest, legal or equitable, in the reversion, and no reason is perceived why a court, proceeding upon equitable principles, should enforce, at their request, the sale of the reversionary interest which does not concern them." It was urged by appellants that when the estate for years and the reversion vested in Hayward, there was a merger, and that, as to him, the estate for years had ceased to exist. After citing cases holding that "the principles of equity will permit or prevent a merger, as will best subserve the purposes of justice and the actual and just interests of the parties," the court said: "In the absence of an expression of intention, if the interest of the person in whom the several estates have united, as shown from all the circumstances, would be best subserved by keeping them separate, the intent so to do will ordinarily be implied. Such is the rule enunciated in the cases cited *supra.*"

Had Bensley purchased the reversion before the partition suit was begun and had objected, his interest could not have been sold. We can perceive no reason why by mere operation of law, so to speak, this reversion, subsequently acquired, can, in effect, be incorporated in the decree. In the case here there is no claim that fraud, accident, or mistake or other ground exists which would alone justify the assumption that it was the intention of the parties or the court in its decree to include the after-acquired title of Bensley. Beyond question the sale under a partition decree is a judicial sale, and we can see no reason why the rule in execution sales does not apply, and the rule there is that the purchaser "takes the precise

interest of the defendant. An after-acquired title by the judgment debtor does not pass to the purchaser.'' (*Frink* v. *Roe,* 70 Cal. 296, 302, [11 Pac. 820].)

It remains to inquire whether or not defendants' alleged adverse possession conferred title to the reversion. The court in effect so determined, for it found that defendants, by their predecessors in interest and by themselves, have been in the actual, open, continuous, and adverse possession of the lots from the date of the alcalde deed to Parker, claiming to be the owners in fee simple.

Among the stipulations or admissions found in the record is the following: ''It is also admitted that the said defendants by divers mesne conveyances hold the title conveyed to Wm. C. Parker by the alcalde deed of the property claimed by them, and that said Wm. C. Parker ever since the date of his deed and his grantees and said defendants have been and now are in the actual and peaceable possession of said lands claimed by them under said alcalde's deed *and the act of March 26, 1851.''*

In the case of *Chapin* v. *Bourne,* 8 Cal. 294, one of these alcalde deeds—Leavenworth, alcalde, to Wm. C. Parker—was before the court. The right of the party claiming under it turned upon the fact that there was no evidence of its recordation as required by the act of 1851, and hence the grant to Parker passed to the city of San Francisco, and the commissioners, under the act of 1853, could only sell the reversion. Speaking of the grant to Parker, the court said: ''At the time when Leavenworth made the grant to Parker, the pueblo of San Francisco had no title whatever to the water property; it belonged to the United States, who held it in trust for any new state that might be erected out of said territory, and passed to the state of California on her admission, by virtue of her sovereignty. The grant was therefore a nullity. On the 26th of March, 1851, the legislature passed an act granting to the city of San Francisco, for the term of ninety-nine years, certain property known as the beach and water lot property, of which this is a part. The act contained a reservation, in favor of those claiming under alcalde grants and city sales. Such titles were confirmed to the then holders, provided such conveyances were registered and recorded in some book of record on or before the third day of April, 1850, which book was in the possession and under the control of the re-

corder of San Francisco, at the date of the passage of the act.''

Another of the Leavenworth-Parker deeds was before the court in *Seabury* v. *Arthur,* 28 Cal. 143. The question there was as to the priority of one of two alcalde deeds to the same beach and water lot. That of Leavenworth to Parker was dated September 25, 1848; the other was by Alcalde Geary to one Sprague, made on January 3, 1850, and the Parker title was held to have priority. Speaking of the two grants the court said: ''The last sale had no greater validity than the first; and it equally required the confirmatory grant of the legislature to give it validity.''

Concededly, the interest thus granted or confirmed by the state was a leasehold interest for ninety-nine years, and nothing more, the state reserving the reversion or remainder, for the sale of which it made provision by the act of 1853. We think it must follow that Parker's possession and that of his successors in interest was, under this state grant, that of a leasehold interest. His deed had no validity other than that derived from the act of 1851. Having claims, as we have seen, under both the Parker deed and the act of 1851, it must be presumed that he was, after confirmation, holding under a valid grant rather than an invalid one. (*Wood* v. *Curran,* 99 Cal. 137, 142, [33 Pac. 774].) The statute of limitations did not run against the state while the state held the title prior to the grant under the act of 1851. Having entered under the state grant, the statute did not run against the remainder while the state held that interest. Did it begin to run against the holder of the remainder after its purchase by Bensley?

As Parker was holding under the state by virtue of the act of 1851, the case of *Millett* v. *Lagomarsino,* 107 Cal. 102, [40 Pac. 25], and like cases cited by defendants, do not apply. It was there contended that Millett entered into possession as a tenant, and could not initiate an adverse possession without first surrendering possession to his landlord. The court said: ''The rule that it is necessary to surrender possession and again enter, before the possession can become adverse, obtains only where the person claiming to hold adversely was put into possession by the owner, or has at least had possession under such owner. No such relation ever existed between Millett

and Tenney.'' Here, as we have seen, Parker held under the leasehold interest vested in him by the statute of 1851.

Defendants rely upon *Tewksbury* v. *Magraff,* 33 Cal. 237. It was there laid down as the general rule that a tenant cannot dispute his landlord's title. This general rule, however, was said to be subject to several exceptions. One of these, the exception relied upon here, is thus stated in the opinion: ''So if the tenant did not take possession under the lease, but was in possession at the time he took the lease, he may dispute the landlord's title without first surrendering the possession; for not having received the possession from him, he is under no moral or legal obligation to restore it before assuming a hostile attitude.''

It is true that in this case Parker went into possession before he obtained his lease under the act of 1851, but, as was held in *Chapin* v. *Bourne,* 8 Cal. 294, the lot then belonged to the United States, holding it in trust for the state to which it passed upon being admitted into the Union. By continuing his possession under the act of 1851, he accepted the relation thereby created, which was, as we hold, that of landlord and tenant. In the Tewksbury case the court held (page 246) that if the possession was taken by virtue of the lease, the tenant could not rely upon a title afterward acquired to defeat recovery.

As a general rule, the possession of the tenant is that of his landlord, and will be so deemed until the contrary appears, and this rule affects all who may succeed to the possession, immediately or remotely, through or under the tenant. Hence, so long as the relation of landlord and tenant exists, the tenant cannot acquire an adverse title as against his landlord. (1 R. C. L., p. 746.)

Possibly some doubt is cast upon the relationship existing between the holder of the leasehold interest under the act of 1851 and the holder of the remainder under the act of 1853, by the case of *Potrero Nuevo Land Co.* v. *All Persons,* 158 Cal. 731, [112 Pac. 303], first decided in department two. In that case plaintiff's title came down to it through John Bensley, as it did in the present case. In department, speaking through Mr. Justice Melvin, the court said: ''The state having disposed of the fee, subject to the use and occupation for ninety-nine years, its grantees or their ultimate successors in interest occupy the exact position of ownership

formerly held by the state. . . . We see no logical escape
from the doctrine that the relation of landlord and tenant
exists; that the possession of the latter is that of the former;
and that appellant has the right to maintain the action." On
rehearing Justices Henshaw and Lorigan, who signed the de-
partment decision, reached a different conclusion, holding
"that the relation of landlord and tenant, within the meaning
of the McEnerney Act, does not exist between the holder of
the reversionary fee and the holder of the ninety-nine year
term in the beach and water lots of the city and county of
San Francisco. And as the McEnerney Act contemplates
'adverse possession' either by plaintiff, by his tenant, or by
some person holding under him, and as plaintiff's possession
is based wholly upon that of his asserted tenant for years,
since such tenancy does not exist, it necessarily follows that
plaintiff does not come within the provisions of the act and
is not entitled, therefore, to maintain this action." Three
justices, Shaw, Angellotti, and Sloss, concurred in the judg-
ment "solely on the ground that the affidavit accompanying
the complaint is defective." They held, however, that plain-
tiff could maintain the action. In the concurring opinion
written by Mr. Justice Shaw it was said: "One who holds a
particular estate for years by grant is, by a very common use
of language, said to be holding under his grantor, although
there is no obligation to pay rent. In like manner, he would
be holding under the grantee of the remainder. Such re-
mainderman would be entitled to take advantage of the act
to establish a record title to the remainder." Justice Melvin,
of department two, adhered to his original opinion.

But whether or not the technical relation of landlord and
tenant existed as understood by law-writers, it is very certain
that Bensley was a remainderman. It was said, in *Pryor* v.
*Winter,* 147 Cal. 554, 557, [109 Am. St. Rep. 162, 82 Pac.
202], "It has been universally held that the estate of a re-
mainderman is distinct from that of a tenant of a preceding
particular estate, and cannot be in any way affected by any
act of the particular tenant or his grantee." Quoting from
*Jackson* v. *Schoonmaker,* 4 Johns. (N. Y.) 390, 402, the
opinion continues: "Neither a descent cast, nor the statute
of limitations will affect a right, if a particular estate existed
at the time of the disseizin, or when the adverse possession
began, because a right of entry in the remainderman cannot

exist, during the existence of the particular estate; and the laches of a tenant for life will not affect the party entitled.'' Quoting further from Tiedeman on Real Property (paragraph 400) : ''The statute of limitations does not begin to run until the remainder takes effect in possession.'' (See 1 R. C. L., p. 743, and note.)

We do not think the evidence supports the findings, nor do we think the correct conclusions of law were drawn from the findings. Our conclusion is that the finding that plaintiff is not the owner of an estate in inheritance of the property claimed by defendant is not supported by the evidence, nor is the finding that defendants are owners in fee simple of said lands claimed by them respectively.

The judgment and order are reversed.

Hart, J., and Burnett, J., concurred.

'A petition for a rehearing of this cause was denied by the district court of appeal on March 24, 1916, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 20, 1916.