CONTINENTAL OIL COMPANY, a DELAWARE CORPORATION, PLAINTIFF AND RESPONDENT, v. McNAIR REALTY COMPANY, a MONTANA CORPORATION, DEFENDANT AND APPELLANT.

No. 10047.
Submitted March 31, 1960. Decided June 2, 1960.
353 Pac. (2d) 100.

412

LaRue Smith, Jr., Great Falls, for appellant.

Toomey & Hughes, Helena. Michael J. Hughes argued orally for respondent.

THE HONORABLE PHILIP C. DUNCAN, District Judge, sitting in place of Mr. Justice Bottomly, delivered the Opinion of the Court.

This is an appeal from a judgment granting plaintiff specific performance of an option to purchase. For convenience, the plaintiff and respondent will generally be referred to as Continental, and the defendant and appellant as McNair.

On February 17, 1953, one Margaret Conrad Parker, of Kalispell, as trustee under a trust created by the will of Alice Agnes Adams, deceased, leased certain real property in Great Falls to Continental for ten years from April 1, 1954, at a monthly rental of $300 payable in advance on the 1st day of each month, plus a payment based on gasoline delivered at the station and not here important. Also Continental was to pay all taxes levied against the property in excess of $600 per year. The lease contained this provision, giving rise to this litigation:

"(9)    Lessee Preference Right To Purchase: If during the term of this Lease, or during the term of any extension thereof, the Lessor decides to sell the leased premises or the leased premises and the interest, if any, that it may have in the improve-

ments situate thereon, the Lessee shall be given the option to purchase the same at and under the same terms and conditions as contained in a bona fide offer which is acceptable to Lessor, and Lessor shall give Lessee ninety (90) days' written notice of such terms and conditions and Lessee may at any time within said ninety (90) day period notify the Lessor that it will purchase the said premises or said premises and interest, if any, that Lessor has in the improvements thereon under the terms and conditions as contained in said bona fide offer, in which event Lessor shall make said sale to Lessee; but if Lessee fails to notify the Lessor of Lessee's intent to purchase within said ninety (90) days after notice of the terms and conditions of the proposed sale, then Lessor may accept any bona fide offer to purchase the leased premises or the leased premises and interest, if any, that Lessor may have in the improvements situate thereon; provided, however, that if Lessor has not consummated any such sale within six (6) months from and after the expiration of said ninety (90) day period, no such sale shall be made unless and until Lessor shall again provide Lessee with an opportunity to buy in accordance with the provisions of this section. Any sale made by Lessor during the term of this Lease or during any extended term, shall be subject to this Lease. Notice of the intention of the Lessor to sell and the terms and conditions of the sale shall be mailed to Lessee at Butte, Montana, and notice of Lessee that it will exercise its option to purchase shall be mailed to Lessor at 435 Fifth Avenue East, Kalispell, Montana, or by personal service in either case. Notice by mail shall be by registered mail only.''

In December 1954, during the term of the lease, the trustee died, the trust terminated, and fourteen persons became the owners of the realty subject to the lease. In April 1955, four of these persons brought an action in the same district court from which this appeal is prosecuted against the remaining owners and Continental, seeking a partition sale and division of the proceeds among the parties to that action, except Continental.

Jurisdiction was acquired of all parties and on July 6, 1956, the court entered its "Amended Decree of Partition and Order of Sale" which provided:

"I. That the real estate hereinbefore described be sold at public auction to the highest bidder, in the manner provided by law, for cash, ten per cent (10%) of the purchase price to be paid at the time of sale, and the balance to be paid in full upon confirmation.

"II. That said sale be made subject to the Lease to the Continental Oil Company, a corporation hereinbefore referred to. That said Continental Oil Company, a corporation, may become the purchaser of said premises at said sale, or may within a period of ninety (90) days after such sale exercise the preferential option to purchase said premises for an amount equal to the highest bid made by another at such sale as provided in said lease. Should said Continental Oil Company fail to make such purchase or exercise its preferential option as aforesaid, then its preference right to purchase said premises, as provided in Clause (9) of said Lease, shall become, and thereafter be, wholly null and void and of no effect.

"III. That Charles R. Lowery, a disinterested and qualified person to act, be, and he is hereby appointed referee to sell said real estate and of his proceedings hereunder to make due return.

"IV. That upon the coming in of said return of sale and upon confirmation and approval thereof by this Court, said referee shall make conveyance to the purchaser as shall then be directed by this Court."

Pursuant to the foregoing order the realty was advertised by the referee for sale at public auction, the terms to be cash, ten per cent down and the balance on confirmation, the notice including the following:

"The sale is subject to a lease to Continental Oil Company, a corporation, dated February 17, 1953, a copy of which is on file in the office of Hall, Alexander & Burton, 414 Strain Build-

ing, Great Falls, Montana, and may be there inspected by prospective purchasers, and all reservations, restrictions and conditions of record.''

Aside from the notice, McNair knew before the auction that Continental occupied the property and inquired of Continental as to whether it was interested in purchasing the property. No reply was had.

On August 15, 1956, the public auction was held and McNair made the highest bid of $33,000. Continental did not appear at the sale.

The referee made his return of the auction sale and petition for confirmation and on September 7, 1956, the court set October 10, 1956, as the time for the hearing thereof.

On September 20, 1956, Continental mailed a check for $300 for the October rent to the Adams' estate and the estate cashed it.

On October 4, 1956, an attorney for four of the defendant owners in the partition action negotiated with McNair for an increase in the price to be paid for the realty, asking for $36,000 and on October 9, 1956, the attorney appeared in the partition action by objection to confirmation on the ground that the property had a value of not less than $36,000.

On October 9, 1956, Continental gave written notice by registered mail of its election to purchase the property for $33,000 by two registered letters one addressed to, ''Heirs of Alice Agnes Adams, 435 Fifth Avenue East, Kalispell, Montana'', and one addressed to, ''Hall, Alexander and Burton, Attorneys for Heirs of Alice Agnes Adams, Strain Building, Great Falls, Montana''. Both letters asked for abstracts of title brought down to date and stated that it would be necessary for Continental's attorneys to approve the same, after which and upon receipt of a proper warranty deed the purchase price would be tendered.

On October 10, 1956, the referee's return of sale and petition for confirmation came on for hearing. Continental was not

present and McNair increased his bid to $36,000. On October 13, 1956, the court made its "Order and Decree Confirming Sale by Referee and Directing Disbursement of Money", reading in part as follows:

"* * * written objections were filed to the confirmation of such sale by the above-named defendants * * * upon the ground that the said sum of Thirty-three Thousand Dollars ($33,000.00) was disproportionate to the value of said property and that the value of said property was not less than Thirty-six Thousand Dollars ($36,000.00), whereupon the said McNair Realty Company, a corporation, submitted a written bid for said property in the amount of Thirty-six Thousand Dollars ($36,-000.00), and there being no further bids made, and no objections being made to said bid by the plaintiffs * * * or by the defendants * * * or by any other person, the bid of the said McNair Realty Company, a corporation, in the amount of Thirty-six Thousand Dollars ($36,000.00) is accepted, and the objections to the confirmation of said sale are overruled and denied; and,

"(a) It Is Hereby Ordered And Decreed that the sale of said real property to the said McNair Realty Company, a corporation, is hereby in all respects confirmed and approved, and the said Charles R. Lowery, Referee, is hereby authorized and directed, upon payment to him of the sum of Thirty-six thousand Dollars ($36,000.00) to execute and deliver to said McNair Realty Company, a corporation, a deed for the real property so sold in accordance with the notice of sale herein referred to."

McNair paid the balance of the $36,000 and a referee's deed dated October 10, 1956, to McNair, was recorded October 14, 1956. On October 16, 1956, McNair, by letter mailed to Continental at Butte, notified Continental of the purchase, enclosing a copy of the referee's deed, and asked that rent checks be mailed to it.

On October 22, 1956, before the McNair letter of the 16th addressed to Butte was received by the Denver office of Con-

tinental where rentals were paid from, Continental's Denver office mailed a check for $300 for the November rent to the Adams' estate. The estate returned the check to Continental advising it that rent was now payable to McNair. Continental destroyed the check and sent another to E. G. Toomey, Custodian of the Files.

Late in October of 1956, McNair, on inquiry, informed Continental it would not sell for $36,000 or honor the option.

Before November 27, 1956, McNair paid the taxes payable on the property by November 30, 1956, amounting to $1,092.35, and on November 27, 1956, McNair notified Continental of this by letter of that date and asked Continental to reimburse McNair for all thereof over $600, or $492.35, "in accordance with the terms of your lease", and stated that there was due on the rental $200 for October and $300 for November and on December 1st an additional $300 rental would be due. Continental was asked to check these matters and to let McNair have a remittance.

By letter dated November 27, 1956, Continental notified McNair by registered mail of its election to purchase the property for $36,000. The letter asked for a complete abstract of title brought down to date and stated that as soon as the title was approved by Continental's attorneys it would tender the purchase price upon receipt of a proper warranty deed. On November 29, 1956. McNair again informed Continental it would not sell at that price.

About December 20, 1956, Toomey and Hughes, Helena attorneys for Continental, were instructed by their client to take such steps as they thought necessary to secure specific performance of the option, and on the morning of January 7, 1957, Mr. Hughes drove to Great Falls with five drafts on Continental for a total of $37,392.35. In Great Falls Mr. Hughes met Mr. McCahill, a Continental employee, and they cashed the drafts at the First National Bank, asking for large bills, but the largest available were twenty dollar bills. The two then

went to the office of McNair where they were informed that Mr. McNair, the president, was in Mexico, that a Mr. Roberts, who they mistakenly believed was an officer of McNair, was out of town but expected back later in the day, and that Florence Kahla, secretary-treasurer, was ill at home. They were not told of a Mr. Dunlap, vice-president, who had offices elsewhere. Mr. Hughes and Mr. McCahill then went to the home of Miss Kahla but learned she was in the hospital. At the hospital they were told they might see her and went to her room. She was sitting on the bed smoking and advised them that while she had been in the hospital for about a month with laryngitis she was going home the next day. Two tenders were made to her as an officer of McNair, one in the sum of $1,392.35 cash accompanied by a letter addressed to McNair and containing much detail but informing McNair that $900 thereof was a tender of payment of rentals payable under the lease for November and December 1956, and January 1957, and $492.35 thereof was a tender of reimbursement of taxes payable under the lease. The other tender was in the sum of $36,000 in cash also accompanied by a letter addressed to McNair and containing much detail, but informing McNair that Continental was reiterating its election to exercise its option to purchase and demanding a deed to the property. With the letter a short form corporation warranty deed was submitted, but the letter stated this was for convenience, and, ''However, any good and sufficient deed to said premises will be acceptable.'' Miss Kahla phoned McNair's attorney, Mr. La Rue Smith, Jr., and on his advice refused the money but accepted the documents. No reason for the refusal was given. She then asked Mr. Hughes to deliver the papers to Mr. Smith. Mr. Hughes and Mr. McCahill then proceeded directly to Mr. Smith's office with the letters and money where Mr. Smith informed them the tenders were not acceptable because the correctness of the amount due under the lease was questioned and Continental was in default under the lease.

After leaving Mr. Smith's office, Mr. Hughes redeposited the $36,000 in the bank and around noon filed this lawsuit.

In the afternoon, Mr. Hughes again returned to McNair's offices hoping Mr. Roberts would be in, still mistakenly believing he was assistant secretary of McNair. Mr. Roberts was there and Mr. Smith came in. The $1,392.35 was tendered to Mr. Roberts and he refused on the ground that the correctness of the amount was in question and McNair had already been sued. Later that afternoon, Mr. Hughes obtained an order from the court in this action to deposit the $36,000 with the court for the same to "be held during the pendency of this action for payment in accordance with the judgment and decree to be entered herein." The $36,000 was deposited pursuant to the order.

On January 8, 1957, Mr. Hughes, for Continental, deposited the $1,392.35 in the name of McNair in The First National Bank and Trust Company of Helena under the provisions of section 58-423, R.C.M. 1947, and gave written notice to McNair of the deposit.

McNair contends that the doctrine of *res judicata* applies to this case; that both parties became bound by the judgment in the partition action, including the "Amended Decree of Partition and Order of Sale" and the "Order and Decree Confirming Sale by Referee and Directing Disbursement of Money", respectively referred to hereinafter as the order of sale and the order of confirmation, with these results:

1. The order of sale fixed the date on which the option would expire as within 90 days after the auction on August 15, 1956, or November 13, 1956.

2. The order of confirmation cut off the 90-day period fixed by the order of sale for the option to run, and, although it might have been error for the court to have made the order of confirmation before the expiration of the option period on November 13, 1956, Continental's only remedy was in the partition action and not in this independent action, and to hold otherwise is

not only to permit the present action to have the effect of an appeal from the partition judgment but is in direct contravention of section 93-6343, R.C.M. 1947, declaring recorded conveyances from the referee in partition to be a bar against all persons joined in the partition proceedings.

3. Continental, in exercising any option to purchase it might have, could not assume to deal with the property except through the referee in partition the same as all other purchasers were required to do; that in so doing it could not, among other things, exercise the option by notice, but only by payment in cash to the referee, and was only entitled to a referee's deed.

4. The option to purchase applies only to voluntary sales and not to judicial sales, and any rights Continental had under the option arose solely as a result of the judgment in the partition action, and, hence, any question concerning that judgment should have been cared for in the partition action.

Assuming the doctrine of *res judicata* is applicable to this case, it is apparent from reading the order of sale, the pertinent portions of which have been heretofore set out, that it gave Continental two choices: (1) The right to become a purchaser at the sale contemplated, or (2) The right within 90 days after such sale to exercise the preferential option to purchase the premises for an amount equal to the highest bid made by another at such sale as provided in the lease.

Since Continental chose the second course and McNair contends the order of sale fixed the date on which the option would expire as 90 days after the auction, or November 13, 1956, the first query is as to when the sale referred to in the order occurred.

A sale under a partition decree is a judicial sale. Potrero Nuevo Land Co. v. All Persons, 29 Cal.App. 743, 156 P. 876, 879; 29 Cal.Jur.2d, Judicial Sales, § 2, p. 443; 37 Cal.Jur. 2d, Partition, § 84, p. 493; 40 Am.Jur., Partition, §§ 84 and 87, pp. 75, 77. When confirmation of a judicial sale is expressly required by statute, such a sale becomes valid and complete on

confirmation and not before. 29 Cal.Jur.2d, Judicial Sales, § 11, p. 454; 37 Cal. Jur.2d, Partition, § 85, p. 494; 30A Am. Jur., Judicial Sales, § 114, p. 967; 50 C.J.S. Judicial Sales § 25, p. 612; Clement v. Ferguson, Okl.1955, 287 P.2d 207, 212; In re Spokane Savings Bank, 198 Wash. 665, 89 P.2d 802, 805. Until a judicial sale is confirmed the purchaser is a mere preferred proposer. 30A Am.Jur., Judicial Sales, § 152, p. 989; Holt v. May, 235 N.C. 46, 68 S.E.2d 775. A bid up to the time of confirmation is merely an offer to buy. In re Spokane Savings Bank, supra. "Until confirmed by the court, the sale [auction] confers no rights. Until then it is a sale only in a popular and not in a judicial or legal sense." Saunders v. Stults, 189 Iowa 1090, 1093, 177 N.W. 516, 518, 11 A.L.R. 394, quoting from Rorer on Judicial Sales, § 124, p. 55. Therefore a judicial sale is not deemed made until it is confirmed, 30A Am.Jur., Judicial Sales, § 114, supra; Holt v. May, supra.

Additionally, here certain heirs objected in writing to the bid of $33,000 made by McNair at the auction as being insufficient, and at the hearing on confirmation on October 10, 1956, McNair submitted another bid in writing for the larger sum of $36,000. This bid was accepted by the court and the sale then confirmed to McNair for that price. It seems plain from these facts that no sale did in fact occur until October 10, 1956.

However, McNair argues that the facts just mentioned do not constitute a sale made to it on October 10, 1956, but rather what occurred is that McNair, the original bidder, advanced its bid and a sale to McNair as of August 15, 1956, the day of the auction, was confirmed at an advanced price. The argument is that under the law an advanced bid made before confirmation is not grounds for setting a sale aside and ordering a new sale, and that the applicable Montana statutes do not empower the court to make sales but only to confirm or set aside sales made by referees; and that under section 93-6331, R.C.M. 1947, sales in partition must be made by referees:

▮▮ The statute just cited does not forbid sales by the court on confirmation. but merely states how sales by referees must be made. Nor does any other statute forbid sales by the court on confirmation in partition or other judicial sales. The matter is one of case law which sets forth three doctrines: (1) the mere fact that a higher bid of a sufficient amount has been received is sufficient reason to refuse confirmation and open the bidding; (2) the mere fact that a higher bid has been received is not sufficient reason for refusal to confirm the sale; (3) the entire matter of confirmation is left with the court, to be confirmed or not according to its discretion. 30A Am.Jur., Judicial Sales, § 105, p. 963; 11 A.L.R. 401; 152 A.L.R. 533. McNair stands on the second doctrine, but it is obvious that the court here, in refusing to confirm the sale at $33,000 and in accepting the $36,000 bid and then confirming its own sale, followed either the first or third doctrine. There are numerous cases illustrative of the propriety of the court's action in accepting a higher bid in open court. See, for example, Criswell v. Criswell, 227 Iowa 212, 288 N.W. 130; Criswell v. Criswell, 230 Iowa 27, 296 N.W. 735, 300 N.W. 533; State v. Hatfield. 136 W.Va. 342, 67 S.E.2d 529; Straus v. Anderson, 366 Ill. 426, 9 N.E.2d 205; Lancaster County v. Schwarz, 152 Neb. 15, 39 N.W.2d 921; Dyer v. Dyer, 220 Iowa 405, 262 N.W. 671; Knouse v. Knouse, 157 Neb. 748, 61 N.W.2d 388; Parker v. Owen, 96 Cal.App.2d 78, 214 P.2d 417.

But whether or not the court acted properly in this case, to uphold McNair's contention that under the law a higher bid made before confirmation is not grounds for setting aside a sale, or its contention that under the statutes the court could not conduct a sale itself at confirmation, or both contentions, would be to invalidate the actual proceedings that took place at the confirmation hearing and to void the order of confirmation. This would be to hold that no sale ever occurred and not that the court confirmed a sale on August 15 at an advanced price. No sale could occur as a result of a bid or offer that was never

accepted, even though that bid was made by a bidder who had a later and higher bid accepted. The only sale that could have been made to McNair was on October 10, 1956, when its higher bid was accepted at the confirmation hearing. To now hold that even that sale did not take place for the reason that the court could not conduct a sale itself at the confirmation hearing and make an order confirming it would be, of course, not only to permit McNair to make a collateral attack on the partition proceedings in an independent action, but ignore the fact that McNair is estopped therefrom by its own very active and positive participation in bringing the sale about and acceptance of its fruits. 30A Am.Jur., Judicial Sales, § 284, p. 1066, Annotation, 2 A.L.R.2d 6. Also see Bury v. Bury, 69 Mont. 570, 223 P. 502; Fox v. Curry, 96 Mont. 212, 29 P.2d 663. "A party who participates in or contributes to an error cannot complain of it." McDonald v. McNinch, 63 Mont. 308, 206 P. 1096, 1098; Ferris v. McNally, 45 Mont. 20, 121 P. 889.

■■ With reference to McNair's contention that the order of confirmation cut off the 90-day period fixed by the order of sale for the option to run, we have already seen that no sale at all took place until October 10, 1956, when McNair's second offer was accepted by the court by confirmation. Hence, if this contention of McNair's is correct, then the 90-day period never began and Continental never had nor could have had an opportunity to exercise the option. This is not only unreasonable but contrary to the terms of the order of confirmation which directs the referee to execute a deed, "* * * in accordance with the notice of sale." The notice of sale stated that the sale was subject to the lease to Continental and to "all reservations, restrictions and conditions of record." The order of sale, which gave the notice life and validity, and any sale at all, and particularly this sale, life and validity, was on file and of record with the court at the time the notice was given, and one of the conditions contained therein was that the sale was subject to the condition that Continental could exercise its preferential

option to purchase within 90 days after the sale. Further, the referee's deed that was issued under the order of confirmation and was accepted by McNair and under which it claims title to this day, refers to the order of sale as being on file and of record and specifically states that the order of sale is made a part of the deed. The same statements apply to the order of confirmation, and the deed states the property conveyed is the right, title and interest of the heirs, "subject to lease to Continental Oil Company, a corporation, dated February 17, 1953, and to all reservations, restrictions and conditions of record." Also the function and effect of confirmation of a judicial sale is primarily to determine that the sale has been made in due compliance with the decree ordering the sale. 50 C.J.S. Judicial Sales § 29, p. 621; 30A Am.Jur., Judicial Sales, § 139, p. 981, and cases cited thereunder. The order of confirmation necessarily included a determination that Continental should have 90 days from the only sale that was made, October 10, 1956, within which to exercise its option.

Since it appears that the sale occurred on October 10, 1956, and that under the order of sale Continental had the right to exercise its option within a period of 90 days after the sale for an amount equal to the highest bid made by another at the sale as provided in the lease, it does not seem necessary to consider at length McNair's contention that Continental, in exercising its option, could not assume to deal with the property except through the referee. When the sale of October 10 was completed the property passed from any control the referee might have had over it. Secondly, the order of sale provided that the option should be exercised "as provided in the lease", which provided for the giving of notice to "the Lessor", who was not at any time the referee. Finally, the only authority vested in the referee, either by the orders of the court or by statute, was to conduct an auction, make a return of the proceedings, execute a deed to McNair upon payment of the price bid, disburse the money so received to the persons entitled

thereto, and report his actions to the court. The referee had no authority beyond the matters just mentioned. 50 C.J.S. Judicial Sales, § 12, subd. d, p. 594.

Respecting the fourth position McNair takes under the doctrine of *res judicata,* that is, that the option applies only to voluntary sales and not to judicial sales, McNair submits that it is clear from the language of the option that it applies only to voluntary sales, and this is also true as a matter of law concerning an option such as the one here involved; thus, either as a matter of fact or as a matter of law, any rights Continental had under the option arose solely as a result of the judgment in the partition action and not as a result of contract. Consequently this action is not one to compel specific performance of a contract, but to compel specific performance of a judgment, an action that does not lie. Any question concerning the judgment in the partition action should have been taken care of in that action and by not so doing the doctrine of *res judicata* becomes applicable to this case.

Actually, this amounts to a contention that the court was in error in the partition proceedings in ordering the sale to be made subject to the option, and that for this reason the portion of the decree which gave Continental the right to exercise the option, or, in other words, the right to enforce a contract which the court in its orders specifically recognized as subsisting and subject to enforcement, should be ignored. It is in reality a collateral attack by McNair precluded by the doctrine of *res judicata,* for if there was error, it was error in jurisdiction since the court had jurisdiction over both the subject matter and the parties and the decree cannot then be collaterally impeached for irregularity or error. Thomas v. Thomas, 44 Mont. 102, 113, 119 P. 283, 285-286; McNitt v. Turner, 16 Wall. 352, 21 L.Ed. 341, 348; 30A Am. Jur., Judicial Sales, § 28, p. 921. McNair is likewise precluded by the doctrine of estoppel from attacking the validity of the provision in the decree while at

the same time claiming its benefits. 30A Am.Jur., Judicial Sales, § 284, p. 1066, Annotation, 2 A.L.R.2d 6.

Leaving the doctrine of *res judicata,* a further contention of McNair is that the option to purchase, and the lease, constitute a single agreement, that the consideration for the option is the performance by Continental of the covenants of the lease, that here there was a failure of consideration for the option, rendering it void and unenforceable by the failure of Continental to pay or tender McNair at any time $200 rental for October 1956 (i. e., two-thirds of the rent for that month since it became the owner on October 10), and the failure of Continental to pay or tender McNair rentals until at least January 7, 1957, and not as they became due and payable under the lease, the rentals falling due on November 1, 1956, December 1, 1956, and January 1, 1957, amounting to $300 for each month, and the sum of $492.35 in taxes advanced by McNair in November 1956.

▉ Respecting the October rent, the general rule is that, in the absence of a statute or contractual provision to the contrary, rent cannot be apportioned as to time, and as between parties owning property at different times, the owner of the property at the time the rent becomes due is entitled to the rent. Tiffany Real Property (3rd ed.), Rent, § 888, p. 544; 52 C.J.S., Landlord and Tenant, § 516, p. 319; 32 Am.Jur., Landlord and Tenant, § 453, 454, pp. 372, 373. The same rule applies where rent is paid in advance, 32 Am.Jur., Landlord and Tenant, § 455, p. 374, and to judicial sales in a situation such as this one, 30A Am.Jur., Judicial Sales, § 169, p. 1000. Attention is also called to section 67-1614, R.C.M. 1947, to the effect that payment of rent to the grantor, by the tenant, before notice of the grant, is binding on the grantee and the tenant is not liable to the grantee for any breach of the condition of the lease until he has had notice of the grant. Here the lease provided that the rents should be payable monthly in advance on or before the first of each month. Continental paid the October rent to the Adams' estate by check mailed September 20, 1956,

and the sale was not made until October 10, 1956. Any contention that Continental should have paid the referee is already disposed of.

Concerning the rents for November, December, and January and the tax obligation, it appears true that the lease and option are a single agreement and that while it is also true that if the lease terminates because of failure of consideration, the option falls with it, the converse is likewise true.

Section 13-724, R.C.M. 1947, provides that time is never considered the essence of a contract unless by its terms it is expressly so provided. The lease contains no provisions specifying the time for repayment of the taxes, and in addition contains a specific provision that time is not of the essence of the contract, for the provision gives Continental a reasonable time, even after a judicial determination that it has failed to perform any of its covenants, within which to perform them. The provision is as follows:—

"(17) Forfeiture: It is agreed that this Lease shall never be forfeited, cancelled, or terminated for failure to perform in whole or in part any of the covenants or agreements herein contained until it shall have first been finally and judicially determined that such failure exists and Lessee has been given a reasonable time after such final determination to comply with any such covenants and agreements."

Where a lease with option to purchase does not state that time is of the essence, failure of optionee to perform the covenants strictly at the time they may or should be performed will not cause him to lose his right to specific performance of the option. 32 Am.Jur., Landlord and Tenant, § 309, pp. 287, 288; Annotation, 115 A.L.R. at page 384. And see Crowell v. Braly, 169 Cal.App.2d 352, at page 354, 337 P.2d 211, at page 213, where it was held that failure to pay taxes did not result in forfeiture of a lease and terminate an option to purchase, the court saying:

"In dealing with defendant's first point, that plaintiff was not entitled to exercise the option to purchase at a time when he was in default in the performance of a material covenant of the lease, it must be remembered first that all defaults do not necessarily terminate or prevent the exercise of an option nor do they, of themselves, work a forfeiture." The court cites several cases and then quotes with approval from Katemis v. Westerlind, 120 Cal.App.2d 537, 543, 261 P.2d 553, 558, as follows: " '* * * the modern view [is] that valuable contractual rights should not be surrendered or forfeitures suffered by a slight delay in performance unless such intention clearly appears from the contract or where specific enforcement will work injustice after a delayed tender'." This last case also contains an extended discussion as to when time is of the essence, and quoting from Miller v. Cox, 96 Cal. 339, 31 P. 161, states that " 'In order to render time * * * essential, it must be clearly and expressly stipulated that it shall be so; it is not enough that a time is mentioned during which or before which something shall be done.' "

While there was some delay involved here, the general fact situation already set out seems to be an adequate explanation, but it may be pointed out, at the risk of repetition, that while McNair notified Continental that it was the owner of the property and of the payments that should be made to it, there never was any demand that these rentals and taxes be paid by any specific date, and no attempt was ever made by McNair to terminate the lease prior to the commencement of this action; that when Continental on the morning of January 7, 1957, made a tender of cash in the sum of $1,392.35 to Florence Kahla, as secretary-treasurer of McNair, as payment of the November, December, and January rents and the tax obligation, no reason was given by her for refusing the money, although later Mr. Smith, attorney for McNair, stated the correctness of the amount was questioned and that Continental was in default under the lease; that when Continental deposited the $1,392.35 in McNair's

name in the Helena bank, Continental, in giving notice to McNair of the deposit, advised:

"* * * If other amounts were due and payable to the Lessor under said Lease on January 7, 1957, or if you deem yourself entitled to compensation for any delay in payment, Continental Oil Company hereby offers to pay such amounts to you when you advise it of the correct amount, under full reservation of its rights and without waiving its preferential option to purchase as aforesaid."

Section 58-415, R.C.M. 1947, provides that where delay in performance is capable of entire compensation, and time has not been made of the essence, an offer of performance, accompanied with an offer of such compensation, may be made at any time after it is due, but without prejudice to the rights of the creditor. Section 58-424 provides that all objections to the mode of an offer of performance which the creditor has an opportunity to state at the time to the offeror and which then could be obviated by him, are waived if not then stated. Section 93-2201-1 provides that an offer in writing to pay is, if not accepted, equivalent to tender. Section 93-2201-3 provides that a person to whom a tender is made must, at that time, specify any objection he may have, or be deemed to have waived it.

Since time of payment was not of the essence of the lease and McNair had taken no steps to terminate the lease, the only objection to the late tender of the rentals which could have been made was that McNair was entitled to compensation for the delay. This objection was not only waived under the statutes mentioned by McNair's silence but even so Continental offered to pay any additional amount that might be due when advised thereof. Our view that failure of Continental to make the rental and tax payments strictly on time, under the circumstances of this case, will not cause Continental to lose its right to specific performance is further fortified by section 17-809, which permits specific performance if the failure to perform by the buyer is "only partial, and either entirely immaterial, or

capable of being fully compensated; in which case specific performance may be compelled, upon full compensation being made for the default." See Crowell v. Braly, supra, 169 Cal.App.2d 352, 337 P.2d 211, citing an identical California statute in a similar case in a similar situation.

We have carefully examined the remaining contentions of McNair and are of the belief that they do not warrant discussion in an already over-long opinion.

The judgment is affirmed.

MR. CHIEF JUSTICE HARRISON, MR. JUSTICES ADAIR, CASTLES, and THE HONORABLE CHARLES B. SANDE, District Judge, sitting in place of MR. JUSTICE ANGSTMAN, concur.